# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                   DECISION AND ORDER

   -v-                                              08-CR-6264 CJS


JON LUCAS AND
LAMAR RICHARDSON,
                            Defendants.

_____

## INTRODUCTION

The defendants, Jon Lucas ("Lucas") and Lamar Richardson ("Richardson"), stand accused in a five-count indictment of crimes relating to drug trafficking. Lucas moved to suppress tangible property taken from him on the day he was arrested. Richardson has moved to suppress tangible property recovered from the premises in which he was arrested, as well as certain statements he purportedly made to the police.

In regard to the defendants' applications, a hearing was held on March 15 and March 23, 2009. Officers Matthew Klein ("Klein"), Steven Kennedy ("Kennedy"\"), and Jason Kamykowski ("Kamykowski"), as well as Investigator Trevor Powell (Powell"), all of the Rochester Police Department, testified at the hearing.

The Court, having considered the testimony presented and exhibits received into evidence at the hearing, and having made evaluations regarding credibility, makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

Klein is a police officer with the City of Rochester Police Department. He has been so employed since March of 2005, and is currently assigned to the Eastside Patrol Division. In July of 2008, he was assigned to the Tactical Unit. On July 23, 2008, he worked the fourth platoon from 7:00 p.m. to 3:00 a.m. the following day. At about 8:30 to 8:45 p.m. on July 23, 2008, Klein received a phone call on his cell phone from a concerned citizen ("citizen informant"), who did not identify himself or herself by name. Prior to July 23, 2008, Klein had spoken to this individual approximately thirty times. Klein knew where the citizen informant lived and knew the citizen informant's telephone number. The citizen informant told Klein that he/she had just left 1955 E. Main Street Apartment A-1, and that there were two persons inside the apartment. The citizen informant further told Klein that the two persons were selling drugs outside the apartment, that there was a shotgun located inside the apartment, and that the door to the apartment was barricaded with a couch. The citizen informant told Klein that one of the individuals was a drug dealer named Luda. The citizen informant told Klein that, to get Luda to open the door, he should say, "You know me, I'm from up the road at Kelly's place." Klein knew that Kelly was a reference to Robert Kelly, a known user.

The citizen informant was a resident of the area, did not have any criminal charges pending, and did not ask Klein for anything in return for the information being provided. In

the past, the citizen informant had provided Klein with information about criminal activity in the East Main Street area, which had proven to be accurate and reliable. Klein knew Luda to be the nickname of defendant, Jon Lucas. The phone call with the citizen informant lasted about two to three minutes.

In response to the information that he received from the citizen informant, Klein proceeded to 1955 E. Main Street, arriving between 8:45 p.m. and 9:00 p.m. He was accompanied by his partner Officer Brad Pike ("Pike"). 1955 E. Main Street is a horseshoe shaped apartment complex with buildings lettered A through E. Upon arrival, Klein and Pike took up a concealed position outside of 1955 E. Main Street, and from their vantage point, were able to observe two to three males standing in front of the apartments. Klein and Pike maintained their concealed position for about hour during which time the males seemed to come and go sporadically.

After this time, due to the minimal foot traffic, Klein called other tactical officers to conduct a knock and talk to see how credible the information from the citizen informant was. A knock and talk is a procedure employed by the police department whereby no more than two plain clothes or uniformed police officers will knock on a residence door and attempt identify the persons inside, as well as try to make observations within the premises to confirm or rule out criminal activity within the location. Klein and Pike were joined by Kennedy, along with officers Hartley,[1] Wilcox, Beer, and Kamykowski. Once the other officers arrived, Klein briefed them on the situation, and Klein proceeded to go inside Building A of 1955 E. Main Street. He entered through an unlocked door into a common

---

[1]The first names of Officers Hartley, Wilcox and Beer were not indicated in the hearing.

hallway and went to the door for Apartment # A-1. It was approximately 11:04 p.m., and Klein was in full uniform, including badge, patches and gun belt. The other officers present at the scene were also dressed in their uniforms. Klein stood on stairs to the left of the door of Apartment A-1, and he knocked on the door with his right hand. When Klein knocked there was a response of "who" from inside the apartment. Klein replied, as instructed by the citizen informant, "You know me, you know me from up the road at Kelly's place." There was a short delay of about ten to thirty seconds, during which time Klein could hear something scraping or sliding on the floor within the apartment. Consistent with what the citizen informant had told him, Klein believed this to be a furniture being moved from in front of the apartment door.

Klein then heard the door knob of the apartment door being turned, at which time, he stepped down from the stairs so that he was squarely in front of the door as it opened. When the door opened, Klein observed an individual, who he subsequently was able to identify as Richardson, peering down the sights of a shotgun leveled about twelve inches from Klein's chest. Klein looked at Richardson's face, and started yelling, "police, gun, gun, gun." Klein simultaneously moved for a position of cover and called for other officers, at which time the apartment door slammed shut. Other officers arrived almost immediately, and they and Klein began shouting, "police, open the door, police, open the door." Klein alerted the other officers to the shotgun, and he heard rustling coming from inside the apartment.

At that point, the apartment door again opened, and Klein observed the same person, Richardson, who had just pointed the shotgun at him. Upon opening the door Richardson put his hands in the air. Klein also observed a second male with his hands up

4

standing in hallway in the kitchen area. With his service weapon drawn, Klein proceeded to yell for everyone to come out of the apartment, and from outside the apartment door, asked Richardson who else was inside the premises. In response, Richardson replied, "just us." However, Klein did not know for sure whether there were, in fact, any other individuals within the apartment. Furthermore, although Klein ordered them out of the apartment, Richardson lay down on the floor, while the other male went down to his knees. Therefore, Klein and other officers entered into the apartment to take both into custody.

Moreover, since he could not see the shotgun, and was not sure if there were any other persons within the apartment, Klein and other officers entered the premises to determine if there were any other individuals hiding inside who could potentially harm them while they were taking the persons, whom they could see, into custody. Led by Klein, the officers proceeded into what appeared to be a living room, which led to a hallway in the area of the kitchen. Off the hallway was a bathroom, kitchen, and bedroom. One of the officers handcuffed Richardson. Once inside, Klein recognized the second male, who had gone down to his knees in the hallway, as Lucas, who, as indicated above, he knew went by the nickname of Luda. Kamykowski told Lucas to lie down on the floor, which he did, and then Kamykowski handcuffed him. Upon entering the apartment both Klein and Kamykowski smelled the strong odor of marijuana inside the location.

At the time Kamykowski handcuffed Lucas, he saw a portion of what he believed to be a plastic bag sticking out of the left watch, or small pocket, of the jeans Lucas was wearing. Kamykowski asked Lucas what was in the bag, and Lucas responded that it was

marijuana.[2] Kamykowski removed what was a plastic sandwich bag from Lucas' pocket, and observed within the bag a green leafy substance, which he believed to be marijuana, and which subsequently tested positive for the presence of marijuana.

Within a few minutes, by approximately 11:10 p.m., the officers conducted a protective sweep of the apartment to ensure that nobody, other than Richardson and Lucas, were inside the premises. The officers searched only those areas where a person could hide. In the course of conducting the protective sweep, Kennedy located a shotgun in plain view in the bedroom area leaning against a wall. In the bedroom, Kennedy also observed a strong box that was partially open, inside of which he saw shotgun shells. About twenty to thirty minutes after securing the premises and after the arrival of a sergeant, Klein left 1955 E. Main Street to apply for a search warrant. However, before he left, as he emerged from the bedroom area back into the living room, Richardson asked Klein, "Klein, Klein, what are you doing at my door?" Richardson's question was not in response to anything said or done by Klein or any other officer.[3]

Powell is a police officer with the Rochester Police Department and has been so employed for the past twelve years. For the last two years, he has held the rank of Investigator. On July 24, 2008, pursuant to his duties as an investigator with the Rochester Police Department, he had contact with Richardson in interview room 123 at the Department's Eastside office, located at 630 North Clinton Avenue. Along with Investigator

---

[2]Since Lucas was clearly in custody when Kamykowski asked the question and had not been *Mirandize*d, the government has conceded that Kamykowski's question and Lucas' answer must be suppressed.

[3]Richardson did not move to suppress this question he asked of Klein.

Seth Carr ("Carr"), Powell entered interview room 123 at about 2:55 a.m. Interview room 123 is approximately 8 x 12 feet in size. Richardson was sitting in the room with his left hand handcuffed to a ring under the table. Upon entering, Powell may or may not have removed the handcuffs. Powell, though, did introduce himself, and asked Richardson if he needed to use the restroom, wanted anything to eat or drink, or needed a smoke. Richardson said no to the restroom and to something to eat or drink, but did say to Powell that, if he had a smoke, he would like one. In response, Powell gave him a Newport cigarette. Powell then asked Richardson about his education level, to which Richardson responded that he attended twelfth grade at East High School, but was kicked out because of marijuana.

Powell then proceeded at 3:00 a.m. to advise Richardson of his *Miranda* warnings, using a standard Rochester Police Department Notification and Waiver, received into evidence as Exhibit # 6, to assist him. In a regular speaking voice, Powell read Richardson the five warnings exactly as they appear on Exhibit # 6. He then read Richardson the two waiver questions that appear on Exhibit # 6. Powell first asked, "Do you understand what I just said to you," to which Richardson responded, "Yes." Powell then asked, "With these rights in mind, do you agree to talk to me now," to which Richardson also responded, "Yes."

Powell then proceeded to ask Richardson what happened. In response to this question, Richardson stated that he was in an apartment, heard a knock on the door, asked who it was, and the person said R. Kelly or Kelly. He went on to explain that he opened the door and then shut the door, and then he heard someone say, "Rochester Police Department." At that point, he said that he opened the door for the second time, and the police entered. Powell then asked Richardson if he had a shotgun, but he denied

having one. Next, Powell asked him if he knew Officer Klein, to which Richardson responded, "Yes", he knew Officer Klein and that he was a good dude.

Powell then stated to Richardson that Klein saw him point a shotgun at him, and Richardson replied that Klein may have seen him point something at him but it wasn't a shotgun. However, when Powell told him that the police swab all weapons for DNA, and that the his DNA from the discarded cigarette butt was going to be compared with the DNA from the shotgun to see if he handled it in the past, Richardson admitted holding the shotgun or placing the shotgun behind the bedroom door. Powell then asked Richardson to give a written statement, but he declined to do so. At that point, at 3:30 a.m., the interview was terminated.

During the course of the interview, Richardson responded to the questions that Powell asked him, and his responses were coherent. At no time during the interview, did Powell or Carr, who was present, ever threaten Richardson or use any physical force against him to get him to speak with him. Additionally, neither Powell nor Carr made Richardson any promises to get him to talk. Moreover, Richardson never indicated that he wanted a lawyer, nor did he, prior to being asked to sign a written statement, ever indicate that he did not want to talk with the police. Further, Richardson, did not appear to Powell to be under the influence of alcohol or drugs, nor did he appear to be sick or injured. He never complained to Powell of being ill.

### CONCLUSIONS OF LAW

Both Richardson and Lucas maintain that they were arrested by the police without probable cause. Lucas, therefore, argues that any evidence subsequently seized from his person, including "a bag of marijuana, $432.00 of U.S. currency in multiple denominations,

and a sandwich bag with five smaller ziplock bags containing of crack cocaine" must be suppressed. (Lucas' Post Hearing Letter Memorandum of Law, dated April 30, 2010, at 1.) Richardson contends that "[t]he entry by law enforcement into the Defendant's apartment violated his Fourth Amendment right to be free from unreasonable search and seizure." (Richardson Post Hearing Memorandum in Support of Motion to Suppress Evidence, April 30, 2010, at 3.) Consequently, he contends that anything flowing from the illegal entry including the shotgun, shells and any statements to Powell and Carr must be suppressed.

a.    Probable Cause

"Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."*Brinegar v. United States*, 338 U.S. 160, 175-76 (1949), (quoting *Carroll v. United States*, 26 7 U.S. 132, 162 (1925).)  Furthermore,

> The long-prevailing standard of probable cause protects "citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime," while giving "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160 (1949). On many occasions, we have reiterated that the probable-cause standard is a "'practical, nontechnical conception'"that deals with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar, supra*, at 175-176); *see, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 695 (1996); *United States v. Sokolow*, 490 U.S. 1 (1989). "[P]robable cause is a fluid concept – turning on the assessment of probabilities in partiular factual context – not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S., at 232.

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *See ibid.*; *Brinegar,* 338 U.S., at 175. We have stated, however, that "[t]he substance of all the definitions

of probable cause is a reasonable ground for belief of guilt," *ibid.* (internal quotation marks and citations omitted), and that the belief of guilt must be particularized with respect to the person to be searched or seized, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

***

To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause, *Ornelas*, *supra*, at 696. (Citations omitted).

*Maryland v. Pringle,* 540 U.S. 366, 370-72 (2003). It is well settled that probable cause is an objective standard. It either exists or it does not, and the inquiry is not whether the officer arrested the defendant for the "right" offense, but whether the circumstances, when viewed objectively, justified his conduct. *Scott v. United States,* 436 U.S. 128, 138 (1978); *United States v. Dhinsa,*171 F.3d 721, 725 (2d Cir. 1998); *United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir. 1987). Furthermore, a law enforcement officer may use his experience, training and knowledge as a factor in determining that probable cause connecting a defendant with criminal activity exists. *Texas v. Brown*, 460 U.S. 730, 742-43 (1983); *United States v. Almanzar,* 49 F. Supp. 538, 540 (S.D.N.Y. 1990).

Further, with respect to whether information provided to law enforcement by an informant generally, and by a citizen informant specifically, provides probable cause:

"The reliability of information provided by a confidential informant can be established if 'the person providing the information has a track record of providing reliable information....' " *Warren v. Williams*, No. Civ.A. 304CV537, 2006 WL 860998, at *16 (D.Conn. Mar. 31, 2006) (quoting *United States v. Wagner*, 989 F.2d 69, 72-73 (2d Cir.1993)). "Typically, and most often in the context of a suppression hearing, an informant's reliability can be established by testimony by a law enforcement officer regarding previous information learned from an informant." *Warren*, 2006 WL 860998, at *16 (citing *United States v. Pena*, 961 F.2d 333, 340 (2d Cir. 1992)).

Thus, while information from an anonymous informant generally requires some sort of corroboration to be considered reliable, see *Florida v. J.L.*, 529 U.S. 266, 270-71 (2000), "[w]here informants are known [to the officer], ... a lesser degree of corroboration is required." *United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007). Indeed, "[t]he veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted." *Id.*; see also *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir.1975) (noting the "peculiar likelihood of accuracy" of a citizen informant's report); *United States v. Smith*, 182 F.3d 473, 483 (6th Cir.1999) ("information supplied by an informant of proven reliability may be sufficient, standing alone, to demonstrate probable cause") (citing *McCray v. Illinois*, 386 U.S. 300, 302-04 (1967)).

\*\*\*

In *Adams v. Williams*, 407 U.S. 143, 146-47 (1972), the Supreme Court held that a police officer acted justifiably in responding to an informant's tip, where the informant was known to him personally and had provided him with information in the past. In reaching that conclusion, the Court stated that "[t]his is a stronger case than obtains in the case of an anonymous telephone tip," in part because the informant might have been subject to criminal charges for making a false complaint had the tip proved to be incorrect. *Id.* at 146. The Court stated that while "this informant's unverified tip may have been insufficient for a narcotics arrest or search warrant, the information carried enough indicia of reliability to justify the officer's forcible stop of Williams." *Id.* at 147. *See also Florida v. J.L.,* 529 U.S. 266, 270 (2000) (distinguishing between anonymous tip and tip from a "known informant whose reputation can be assessed and who can be held responsible if her allegations turned out to be fabricated"); *Elmore*, 482 F.3d at 180 (same); *United States v. Hayes*, 574 F. Supp. 2d 308, 312 n. 5 (W.D.N.Y.2008) ("The fact that the tipster remained anonymous distinguishes this case from that of an identified private citizen informant whose veracity is generally presumed in the absence of circumstances suggesting that they should not be trusted"); *United States v. Vanhoesen*, 552 F. Supp. 2d 335, 339 (N.D.N.Y.2008) ("the fact that [the informant] was not an anonymous informant is a factor worthy of consideration and one that weighs in favor of crediting his information," in part because he "could have faced adverse consequences if his information turned out to be false").

*United States v. Singleton*, 608 F. Supp. 2d 397, 403 -044 (W.D.N.Y. 2009)

In this case, based upon its findings of fact and the applicable principles, the Court concludes that, prior to taking Richardson and Lucas into custody, the police had probable cause to believe Richardson and Lucas were engaging in drug trafficking and that they possessed a firearm in furtherance of such drug trafficking. The citizen informant, whose identity, address and telephone number Klein knew, told Klein that he had just left 1955 E. Main Street Apartment A-1, and that there were two persons inside the apartment who were involved selling drugs and that there was a shotgun located inside the apartment, the door to which was barricaded with a couch. Additionally, the citizen informant told Klein that one of the individuals was a drug dealer named Luda, which Klein knew to be the nickname of Jon Lucas, and also told Klein to say "You know me, I'm from up the road at Kelly's place" to get them to open the door. The citizen informant did not have any criminal charges pending, did not ask Klein for anything in return, and in the past, had provided Klein with reliable and accurate information about criminal activity in the E. Main Street area.

The information from the citizen informant was based upon his/her firsthand knowledge; the citizen informant had been inside the apartment. Moreover, the citizen informant had just been inside 1955 E. Main Street Apartment A-1 when he/she spoke to Klein between about 8:30 to 8:45 p.m. Within approximately two and a half hours, Klein was able to corroborate the information provided by the citizen informant. After knocking on the door to 1955 E. Main Street Apartment A, and saying "you know me, I'm from up the road at Kelly's place," as instructed by the citizen informant, Klein was able to hear what he believed was furniture being slid away from the door. When the door opened, Klein, who was in uniform, observed Richardson pointing a shotgun toward his chest. In

this regard, the connection between illegal drugs and firearms is well established, *United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008), *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004), *cert. denied*, 544 U.S. 990 (2005), and "is undoubtedly at least as well known to police officers as to anyone." *United States v. Singleton*, 608 F. Supp. 2d at 404. It was therefore objectively reasonable for Klein to believe that the individuals inside 1955 E. Main Street Apartment A were involved in drug trafficking and possessed a weapon in furtherance their drug trafficking activities. *United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003) (recognizing that firearms are regularly found on narcotics traffickers), *cert. denied*, 549 U.S. 1260 (2007).

B.     Exigent Circumstances

It is, of course, clear that, pursuant to the Fourth Amendment, warrantless arrests in a home are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). However, exigent circumstances provide an exception to the Fourth Amendment's warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75, 91 S.Ct. 2022 (1971). In other words, there is no *Payton* violation where it can be shown that police were forced to act quickly due to exigent circumstances; *Brigham City v. Stuart*, 547 U.S. 398, 406-07 (2006). Where, as here, the government argues that a warrantless arrest was necessitated by exigent circumstances, the government bears the burden of establishing by a preponderance of the evidence that such circumstances did, in fact, exist. *Payton*, 445 U.S. at 590. In that regard,

> The test to determine whether exigent circumstances exist "is an objective one that turns on ... the totality of the circumstances confronting law enforcement agents in the particular case." *MacDonald*, 916 F.2d at 769. The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, see *United States v.*

*Zabare*, 871 F.2d 282, 291, 292 (2d Cir.1989), to believe that there was an "urgent need to render aid or take action," *MacDonald*, 916 F.2d at 769 (internal quotation marks omitted).

*United States v. Klump*, 536 F.3d 113, 117 (2d Cir. 2008). Moreover, factors to consider include:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. Crespo*, 834 F.2d 267, 270 -271 (2d Cir. 1987).

In this case, the Court concludes by a preponderance of evidence that exigent circumstances existed justifying the officers' warrantless entry into 1955 E. Main Street Apartment A-1. At the point they entered, Klein and the other officers, as discussed above, had probable cause to believe that the occupants of the apartment were engaged in drug trafficking and possessed a firearm in furtherance of their drug trafficking activities. When the apartment door opened the second time, Klein was able to see Richardson and Lucas, but not the shotgun. Finally, Richardson and Lucas refused the direction of Klein, a uniformed police officer, to come out of the apartment. Clearly, there was an urgent need for the police to take action.

C.   Protective Sweep

The Supreme Court in *Maryland v. Buie*, 494 U.S. 325, 334 (1990), held that, after arresting a defendant inside a home, officers may, "without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." This search for unseen third parties may

14

extend even farther, but only if there are grounds that "would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334. In discussing *Buie*, the  Second Circuit has observed:

> In *Buie*, the Supreme Court identified three types of searches that could be performed during the course of an in-home arrest. First, when an arrest is initiated based on a warrant and probable cause to believe that the target is within the premises, officers are "entitled to enter and to search anywhere in the house in which [the arrestee] might be found. Once he [is] found, however, the search for him [is] over, and there [is] no longer that particular justification for entering any rooms that ha[ve] not yet been searched." *Buie*, 494 U.S. at 333. Next, because of the risks inherent in taking an individual into custody, officers are automatically justified in searching as "an incident to the arrest" the area adjoining the place of arrest "from which an attack could be immediately launched." *Id*. at 334. Lastly, for officers to search further in a protective sweep, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* The justification for a protective sweep is ephemeral: it may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id*. at 335-36.
>
> ***
>
> The government initially contends that because the bathroom adjoined the place where Moran was questioned and ultimately arrested, the search here was of the second sort authorized by *Buie* and, therefore, the DEA agents did not need any articulable facts to justify the search. This argument lacks merit. The distinctions drawn by the Court in *Buie* with respect to pre- and post-arrest searches were based on the legal justification for a particular search, not on the proximity of the area to the arrestee. *Id*. at 333. The Court's justification for permitting a suspicionless search of "spaces immediately adjoining the place of arrest" was the danger inherent in taking a person into custody in a home. *Id*. at 333-34. Here, there was no arrest prior to the search of Moran's bathroom and, therefore, the second type of warrantless search described by *Buie* does not apply.

*United States v. Moran Vargas*,  376 F.3d 112, 116 (2d Cir. 2004) (footnote omitted).

Furthermore, in a case analogous to the one at bar, the Circuit explained:

> Lauter next argues that even if the agents were lawfully in his apartment, the district court should have suppressed the firearm because it was recovered

during an impermissibly broad protective sweep. (The government does not rely on the search warrant to justify the seizure of the shotgun, as that warrant was not for the basement apartment). When arresting a person in a residence, officers may perform a protective sweep incident to the arrest to protect themselves or others. In *Maryland v. Buie*, 494 U.S. 325, 334 (1990), the Supreme Court held that during an arrest, officers may "without probable cause or reasonable suspicion[ ] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Beyond that limited cursory inspection, however, an officer must have articulable facts that support an inference "that the area to be swept harbors an individual posing danger to those present. *Id*. The district court concluded that the back room was "immediately adjoining" the area in which Lauter was arrested, and thus deemed the sweep permissible even in the absence of any particularized suspicion.

***

Aside from looking in the drawer, the fruits of which search were not introduced into evidence, Graham's conduct was well within the scope of a permissible protective sweep, particularly in light of the small size of the apartment. *See*, e.g., *United States v. Robinson,* 775 F.Supp. 231, 235 (N.D.Ill.1991) (bedroom is "immediately adjoining" room in which defendant was arrested). That another agent had already been in the back room did not preclude the possibility that there was some residual danger. Moreover, Graham was justified in looking in the space between the bed and the wall, as a person certainly could have been hiding in that location. As the gun was in plain view and Graham was legitimately in the room, seizure of the weapon was permissible. *See United States v. Jenkins*, 876 F.2d 1085, 1088 (2d Cir. 1989). Because the protective sweep was not overbroad, the district court did not err in declining to suppress the shotgun.

*United States v. Lauter,* 57 F.3d 212, 216 -217 (2d Cir. 1995).

On the facts of this case, the Court concludes that Klein and his fellow officers found themselves in the second search situation discussed by the Supreme Court in *Buie.* That is, because of the risks inherent in taking Richardson and Lucas into custody, the officers here were automatically justified in searching as "an incident to the arrest" the area adjoining the place of arrest "from which an attack could be immediately launched." *Maryland v. Buie* at 334. Based upon the reasoning of *Lauter*, the Court finds that the

bedroom of 1955 E. Main Street Apartment A-1, where the shotgun and shells were observed by Kennedy in plain view, was in fact an area adjoining the area where Richardson and certainly Lucas were taken into custody from which an attack could immediately be launched.

Alternatively, the Court concludes that the facts of this case also fit within the third type of search authorized by *Buie*. *Id.* at 335-36. In other words, Klein articulated facts which, taken together with their rational inferences, warranted a reasonably prudent officer in believing that the bedroom, where the shotgun was located, could potentially have harbored someone who posed a danger to Klein and his fellow officers. More specifically, only a short period of time  elapsed between the first occasion when Richardson opened the apartment door, at which point he leveled the shotgun at Klein's chest, and the second occasion when he opened the door, at which point Klein could observe Richardson and Lucas inside the apartment, but no shotgun. A rational inference to be drawn was that someone else could be in the apartment with the shotgun.

Therefore, pursuant to  *Buie,* since the shotgun and ammunition were in plain view and Kennedy was legitimately in the room, seizure of the items was permissible. *United States v. Lauter,*  57 F.3d at 217.

D.     Custodial Statements of Richardson

It is  well settled that the government may not use any statements obtained from a defendant, whether exculpatory or inculpatory, which were the product of custodial interrogation, unless prior to any questioning the defendant was advised of his constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda v.  Arizona*, 384 U.S. 436 (1966); *Colorado v.  Spring*, 479 U.S. 564 (1987); *Edwards v.*

*Arizona*, 451 U.S. 477 (1981). That is, the government bears the burden of proving by a preponderance of the evidence both that a defendant was advised of his constitutional rights guaranteed under *Miranda* and that he knowingly, intelligently and voluntarily waived his rights. *Lego v. Twomey*, 404 U.S. 477, 482-89 (1972). To establish a valid waiver, the government must prove that the relinquishment of rights on a defendant's part was voluntary, and additionally that the defendant had a full awareness of the right being waived and of the consequences of waiving that right. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).

Moreover, it is well settled that the statements of a defendant himself must be voluntary based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). In that regard, the burden is on the government to prove that a confession is voluntary by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne. *Hayes v. State of Washington*, 373 U.S. 503, 513-14 (1963). In other words, a confession is "involuntary" if it is obtained by "'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 515 (1963)). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). The totality of the surrounding circumstances are evaluated "to determine whether the government agents conduct 'was such as to overbear

[a defendant's] will to resist and bring about confessions not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987)). "The factors to be considered include "the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation.'" *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) (quoting *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984)).

Based upon the above-stated principles of law and its findings of fact, the Court concludes that oral statements made by Richardson to Powell and Carr, are admissible. More specifically, the Court finds that the government has established by a preponderance of evidence that prior to any questioning, Lucas was advised of his constitutional rights as guaranteed by the *Miranda* decision and knowingly, intelligently, and voluntarily waived his rights and agreed to speak to Powell and Carr.

First, in reaching its determination as to the defendant's *Miranda* warnings, the Court relies on several facts as detailed above. Upon entering the interview room, Powell asked Richardson if he needed to use the restroom, wanted anything to eat or drink, or needed a smoke. While Richardson said no to the restroom and to something to eat or drank, he did tell Powell he would like a smoke, and in response, Powell gave him a Newport cigarette. Prior to advising Richardson of his constitutional rights, Powell determined that, although he did not graduate, Richardson had advanced to the twelfth grade at East High School.

Powell then advised Richardson of his *Miranda* warnings, using a standard Rochester Police Department Notification and Waiver, received into evidence as Exhibit # 6, to assist him. In a regular speaking voice, Powell read Richardson the five warnings

exactly as they appear on Exhibit # 6. He then read Richardson the two waiver questions that appear on Exhibit # 6. Powell first asked, "Do you understand what I just said to you," to which Richardson responded, "Yes." Powell then asked, "With these rights in mind, do you agree to talk to me now," to which Richardson also responded, "Yes". Richardson did not appear to Powell to be under the influence of alcohol or drugs; nor did he appear to be sick or injured; nor did he ever complain to Powell of being ill. At no time during the interview did the defendant ever indicate that he wanted an attorney, nor prior to refusing Powell's request for a written statement, did he ever indicate that he did not want to speak with the police.

Second, as to its determination on voluntariness, the Court again relies on its findings of fact. When he entered the interview room, Powell offered Richardson something to eat or drink, as well as the opportunity to use the bathroom, all of which Richardson refused. However, Richardson did accept Powell's offer of a cigarette. The interview was brief and lasted only from 2:55 a.m. to approximately 3:30 a.m. on July 24, 2008. Prior to the interview, the defendant was advised of his *Miranda* warnings, indicating that he understood them, and that he agreed to give them up and speak to Powell and Carr. During the course of the interview, Richardson responded to the questions that Powell asked him, and his responses were coherent. At no time during the interview did Powell or Carr ever threaten Richardson or use any physical force against him to get him to speak with them. Additionally, neither Powell nor Carr made Richardson any promises to get him to talk. Moreover, Richardson never indicated that he wanted a lawyer, nor did he, prior to being asked to sign a written statement, ever indicate that he did not want to talk with the police.

Further, Richardson, did not appear to Powell to be under the influence of alcohol or drugs, nor did he appear to be sick or injured, and he never complained to Powell of being ill. Therefore, the preponderance of evidence establishes that the statements made to Powell and Carr were not the result of any physical or psychological coercion or by the exertion of any type of improper influence, but rather were voluntarily made.

## CONCLUSION

Accordingly, Lucas' application (Docket # 58) to suppress physical evidence is denied, and Richardson's application to suppress physical evidence and statements (Docket # 22) is also denied.

IT IS SO ORDERED.

DATED:          May 24, 2010
                Rochester, New York          ENTER.5


                                     /s/ Charles J. Siragusa
                                     CHARLES J. SIRAGUSA
                                     United States District Court Judge